Filed 5/9/25  P. v. Marquez CA4/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D084063 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD289473) |
| MAEREICHELLE VILLAMOR MARQUEZ, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Reed Webb, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Christine Levingston Bergman, Deputy Attorneys General, for Plaintiff and Respondent.


For the second time, MaeReichelle Villamor Marquez appeals from an order directing that she pay victim restitution to the California Employment

Development Department (EDD) after she pled guilty to engaging in a fraudulent scheme to obtain unemployment benefits by using the personal identifying information of prison inmates.

In her first appeal, Marquez unsuccessfully argued that the victim restitution order to EDD was flawed because the judge who issued it was not the same judge who accepted her guilty plea. (*People v. Marquez* (2023) 93 Cal.App.5th 704, 711 (*Marquez*).) In this appeal, after proceedings were held on remand to determine the amount by which the victim restitution order should be reduced due to EDD's recovery of some of the fraudulently obtained funds, Marquez again contends that we should reverse the restitution order. Specifically, Marquez argues that the trial court erred in declining to review in camera, and then release to counsel, documents she subpoenaed from Bank of America and the California Department of Corrections and Rehabilitation (CDCR).

We conclude that the trial court properly declined to review and release the subpoenaed documents because Marquez did not establish their relevance to determining the amount of economic loss that EDD incurred as the result of Marquez's criminal conduct. Accordingly, we affirm the victim restitution order.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

Marquez and two other defendants were charged with felonies arising from, among other things, participation in a scheme to fraudulently use the personal identifying information of 60 prison inmates to obtain unemployment benefits from EDD. (*Marquez, supra*, 93 Cal.App.5th at pp. 705–706.)

Marquez pled guilty to making a false statement to obtain unemployment benefits (Unemp. Ins. Code, § 2101, subd. (a)), possession for sale of a controlled substance (Health & Saf. Code, § 11351), and unauthorized use of the personal identifying information of another (Pen. Code, § 530.5, subd. (a)). (*Marquez*, *supra*, 93 Cal.App.5th at p. 706.) Marquez admitted that the fraudulent scheme resulted in losses to the victim of more than $500,000 (Pen. Code, § 186.11, subd. (a)(1), (2)), and she agreed that victim restitution to EDD would be joint and several with her codefendants. (*Marquez*, *supra*, 93 Cal.App.5th at p. 706.) The trial court sentenced Marquez to prison for a total term of five years four months. (*Ibid*.) Marquez's codefendants also entered guilty pleas and were sentenced. (*Ibid*.)

At a March 15, 2022 hearing, the trial court ordered victim restitution in the amount of $1,176,235 to EDD, as a joint and several obligation of the three defendants. At that hearing, the People acknowledged that the trial court should reduce the restitution order to take account of any of the fraudulently obtained funds that the People succeeded in recovering and returning to EDD. Among other things, the People explained that they had recently filed a petition pursuant to Penal Code section 186.11, which was directed at funds held by Bank of America.

As explained by the trial court at a subsequent hearing, Bank of America was the institution that received and disbursed the unemployment benefits. "The fraud scheme involved the defendants applying for and obtaining unemployment benefits from EDD in the names of at least 60 inmates from [CDCR] who are not entitled to those benefits. The benefits were placed in accounts held by the Bank of America, which contracts with EDD to disburse unemployment benefits . . . via Visa debit cards. The

3

defendants were subsequently able to access the funds placed in the [Bank of America] accounts using debit cards that were issued in the names of the inmates but were mailed to the defendants." When the fraud was discovered and defendants were arrested, some of the funds remained in the Bank of America accounts. The People's petition pursuant to Penal Code section 186.11, subdivisions (d)(5), (e)(1) and (f)(1), was directed at preserving the funds in the 60 relevant Bank of America accounts and eventually returning them to EDD.

The trial court set a June 15, 2022 hearing to determine the amount by which the restitution order should be reduced due to EDD's recovery of any of the fraudulently obtained funds. However, those proceedings could not go forward on June 15, 2022 because, in the meantime, Marquez had filed an appeal of the trial court's March 15, 2022 restitution order. In her appeal, Marquez argued that the order should be vacated because the trial judge who issued it was not the same trial judge who accepted Marquez's guilty plea. (*Marquez*, *supra*, 93 Cal.App.5th at p. 707.) On July 18, 2023, we issued an opinion rejecting that contention and affirming the March 15, 2022 restitution order. (*Id*. at p. 710.)

After the remittitur issued, the parties renewed with the trial court the pending issue of reducing the amount of the restitution order to take account of any funds the People had recovered and returned to EDD. Relevant to that issue, on October 25, 2023, the trial court signed an order of forfeiture and levy, which stated that all title and interest to the funds held in 60 specifically identified Bank of America accounts shall, as of the date of the order, be deemed forfeited and levied upon to pay restitution to EDD. The order set forth a list of the 60 accounts by identifying the name of the account holder and the debit card number associated with the account. In response to

4

the order, Bank of America issued a check to EDD in the amount of $147,140.84 on November 30, 2023. In its letter transmitting the check, Bank of America stated that the check was sent in response to the trial court's October 25, 2023 order of forfeiture and levy, and that the amount in the check represented "[t]he funds and associated accountholder names for the cards identified in the Order."

On March 5, 2024, the trial court held an evidentiary hearing to determine whether the amount of the restitution order should be reduced due to any funds that had been returned to EDD. In advance of that hearing, counsel for Marquez served subpoenas on Bank of America and CDCR to obtain documents that he contended would be relevant to determining the amount of the restitution order.

The subpoena to Bank of America sought (1) current account balances for the 60 accounts listed in the trial court's October 25, 2023 order of forfeiture and levy; and (2) account statements for those 60 accounts for the months of June 2020, January 2021, June 2021, January 2022, March 2022, January 2023, and October 2023.[1]

The subpoena to CDCR sought information about the inmate trust accounts for the 60 inmates whose personal identifying information was used by the defendants to fraudulently obtain unemployment benefits from EDD. Specifically, the subpoena sought records regarding "(1) deposits of cash and other money into the accounts, (2) account activity, and (3) account balances,

---

[1]    Originally, the subpoena also requested production of "[t]he contract(s) between Bank of America and [EDD]" for "the period from January 1, 2020 through December 31 , 2023." However, counsel for Marquez later informed Bank of America that it need not respond to that request.

5

for the period [of] time from and including June 1, 2020 through and including March 31, 2021."

In response to the subpoenas, both Bank of America and CDCR produced documents, as requested, to the trial court. (See Pen. Code, § 1326, subd. (b) [requiring production to the trial court as provided in Evid. Code, § 1560, subd. (b)].) As stated in Penal Code section 1326, subdivision (d), "When a defendant has issued a subpoena to a person or entity that is not a party for the production of books, papers, documents, or records, or copies thereof, the court may order an in camera hearing to determine whether or not the defense is entitled to receive the documents." (Pen. Code, § 1326, subd. (d).) Citing this provision, on February 20, 2024, counsel for Marquez filed a request that the trial court conduct an in camera review of the documents and thereafter release them to counsel subject to any appropriate protective order.

At a February 22, 2024 hearing on Marquez's request for in camera review and release of the subpoenaed documents, the People argued that the documents likely were irrelevant and suggested that the court defer ruling until witnesses testified at the March 5, 2024 evidentiary hearing.[2] The trial court adopted that approach.

At the March 5, 2024 restitution hearing, the trial court heard testimony from an investigator employed by EDD and from a custodian of records for EDD who worked with that investigator. The testimony established that the total amount EDD paid to the defendants pursuant to the fraudulent scheme was $1,200,888. However, EDD had subsequently

---

[2]    Bank of America appeared at the hearing and raised concerns about providing notice to the account holders and the privacy and confidentiality of the information.

recovered certain amounts. Among other things, law enforcement had seized $306,339.20, and Bank of America had issued a check for $147,140.84. Based on that evidence, the People requested that the trial court order restitution to EDD in the amount of $731,678.96.

At the conclusion of the hearing, the trial court ruled that it would not review and release the documents that counsel for Marquez had subpoenaed from Bank of America and CDCR. As the trial court explained, "There's no evidence there would be anything in those records that would assist the court." The trial court ordered restitution, as a joint and several obligation of the three defendants, in the amount of $731,678.96, plus 10 percent interest running from the date of the issuance of the original restitution order on March 15, 2022.

Marquez filed an appeal from the trial court's March 5, 2024 restitution order.

## II.

## DISCUSSION

Marquez's sole contention on appeal is that the trial court erred by declining to review and subsequently release the documents that her attorney subpoenaed from Bank of America and CDCR. She asks that we reverse the trial court's March 5, 2024 restitution order and remand with directions that the trial court conduct an in camera review of the documents to determine if they should be released to her attorney.

A.    *Applicable Legal Principles*

1.    *Victim Restitution Proceedings*

We begin with an overview of the procedures associated with victim restitution orders. By statute, "in every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require

7

that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (Pen. Code, § 1202.4, subd. (f); see also Cal. Const., art. I, § 28, subd. (b)(13).) To "the extent possible, the restitution order . . . shall be of a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct." (Pen. Code, § 1202.4, subd. (f)(3).)

A defendant "has the right to a hearing before a judge to dispute the determination of the amount of restitution." (Pen. Code, § 1202.4, subd. (f)(1).) At such a hearing, "a prima facie case for restitution is made by the People based in part on a victim's testimony on, or other claim or statement of, the amount of his or her economic loss. [Citations.] 'Once the victim has [i.e., the People have] made a prima facie showing of his or her loss, the burden shifts to the defendant to demonstrate that the amount of the loss is other than that claimed by the victim.' " (*People v. Millard* (2009) 175 Cal.App.4th 7, 26.) "Restitution hearings are intended to be informal." (*People v. Weatherton* (2015) 238 Cal.App.4th 676, 684.) " '[T]he standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt.' " (*People v. Tabb* (2009) 170 Cal.App.4th 1142, 1153.)

2.    *Document Subpoenas in Criminal Proceedings*

The statutory procedures governing document subpoenas in criminal proceedings are also relevant here. "Under Penal Code section 1326, subdivision (a), . . . defense counsel . . . may issue a criminal subpoena duces tecum, and, unlike civil subpoenas, there is no statutory requirement of a ' "good cause" ' affidavit before such a subpoena may be issued. . . . Instead,

8

under subdivision (c) of section 1326, the sought materials must be given *to the superior court* for its in camera review so that it may 'determine whether or not the [requesting party] is entitled to receive the documents.' " (*Facebook, Inc. v. Superior Court of San Diego County* (2020) 10 Cal.5th 329, 343–344, citations omitted].) The question of whether or not a defendant is entitled to receive subpoenaed documents often arises in the context of a motion to quash. In that context, "the subpoenaing party must . . . establish good cause to acquire the subpoenaed records. In other words, . . . the defendant must show 'some cause for discovery other than "a mere desire for the benefit of all information." ' " (*Id.* at p. 344.) Among other factors, a trial court must consider whether the defendant has shown a " ' "plausible justification" ' for acquiring documents from a third party . . . by presenting specific facts demonstrating that the subpoenaed documents are admissible or might lead to admissible evidence that will reasonably ' "assist [the defendant] in preparing his defense." ' " (*Id.* at p. 345.)

3. *Constitutional Rights to Due Process and Compulsory Process*

Here, the trial court concluded that Marquez had not established that the documents subpoenaed from Bank of America and CDCR had any relevance to the proceeding to determine the amount of restitution that should be ordered, and it accordingly denied Marquez's request that it release the documents after conducting an in camera review. Marquez contends in the introduction and argument heading of her opening appellate brief that the trial court's refusal to review and turn over the subpoenaed documents violated her constitutional right to due process. (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7, subd. (a).)

" 'The scope of a criminal defendant's due process rights at a hearing to determine the amount of restitution is very limited: " 'A defendant's due

9

process rights are protected when the probation report gives notice of the amount of restitution claimed . . . , and the defendant has an opportunity to challenge the figures in the probation report at the sentencing hearing.' " ' " (*People v. Marrero* (2021) 60 Cal.App.5th 896, 911 (*Marrero*).)  Further, " ' " '[d]ue process does not require a judge to draw sentencing information through the narrow net of courtroom evidence rules,' " ' " and judges " ' " 'are given virtually unlimited discretion as to the kind of information they can consider and the source . . . whence it comes.' " ' " (*People v. Prosser* (2007) 157 Cal.App.4th 682, 692.)  Under established case law, we analyze whether Marquez's due process rights were infringed during the victim restitution hearing by inquiring whether "the procedures employed by the trial court '[were] fundamentally unfair.' " (*Marrero, supra*, at p. 911.)

In addition to relying on principles of due process, at points in her opening appellate brief, Marquez contends more specifically that the trial court violated her right to compulsory process under the Sixth Amendment to the federal constitution and the equivalent right in the state constitution. (U.S. Const., 6th Amend. ["[i]n all criminal prosecutions," a defendant has the right "to have compulsory process for obtaining witnesses in his favor"]; Cal. Const., art. I, § 15 [a criminal defendant has the right "to compel attendance of witnesses in the defendant's behalf"].)  Marquez has not cited any authority establishing that the constitutional right to compulsory process applies to a defendant's subpoena to obtain documents from a third party in connection with a victim restitution proceeding.

The United States Supreme Court "has had little occasion to discuss the contours of the Compulsory Process Clause." (*Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 55.)  When addressing whether a defendant has the right under the Compulsory Process Clause to "discover the identity of witnesses,

10

or to require the government to produce exculpatory evidence" for use at trial, the high court declined to reach the issue and instead proceeded under "the broader protections of the Due Process Clause of the Fourteenth Amendment," concluding that "compulsory process provides no *greater* protections in this area than those afforded by due process." (*Ritchie*, at p. 56, some italics omitted; see also *People v. Clark* (2011) 52 Cal.4th 856, 982–983 [discussing the uncertainty of whether the compulsory process clause may be invoked to obtain pretrial discovery, and therefore proceeding, instead, under the due process clause]; *Facebook, Inc. v. Superior Court* (2017) 15 Cal.App.5th 729, 742, review granted, S245203, and cause remanded (2020) 10 Cal.5th 329 [declining to apply the compulsory process clause to analyze a defendant's right to obtain documents through a pretrial third party subpoena, and instead applying a due process analysis].)

Not only is it unclear whether the right to compulsory process applies to a defendant's attempt to subpoena documents in preparation for trial (as opposed to witness testimony), it is also unclear whether the right to compulsory process has any application in a sentencing stage victim restitution proceeding. (Cf. *People v. Cain* (2000) 82 Cal.App.4th 81, 86–87 [discussing the Sixth Amendment's confrontation clause (rather than the compulsory process clause), the court held that because a restitution hearing "is part and parcel of the sentencing process," and "California courts have repeatedly held that the defendant does not have a Sixth Amendment right of confrontation at the sentencing stage of a criminal prosecution," the defendant did not have the right, at a victim restitution hearing, to cross-examine the psychotherapist who provided counseling to the victim of the defendant's crime].)

11

Nevertheless, we will assume, without deciding, that the right to compulsory process applies here. To prevail in establishing a violation of the right to compulsory process, a defendant "must plausibly show that the missing testimony 'would have been *both material and favorable to his defense.*' . . . At bottom, ' "[i]n order to declare a denial of [due process based on the denial of compulsory process] we must find that the absence of . . . fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." ' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 367–368 (*Bryant*) citations omitted, italics added].)

B.     *Because the Subpoenaed Documents Were Not Relevant to Any Issue at the Restitution Hearing, the Trial Court Properly Denied the Request to Conduct an In Camera Review and to Thereafter Release Them to Defense Counsel*

Turning separately to the subpoenas that Marquez directed to Bank of America and to CDCR, we examine whether Marquez has established that the trial court violated her right to due process or compulsory process when it concluded that, based on counsel's explanation, those documents were not relevant to the victim restitution proceeding and thus declined to review them and release them to counsel. We apply a de novo standard of review in examining whether the trial court violated Marquez's constitutional rights during the victim restitution proceeding. (*Marrero, supra*, 60 Cal.App.5th at p. 911.)

1.     *The Bank of America Documents*

Counsel for Marquez argued to the trial court that the documents from Bank of America were relevant because they would show whether Bank of America had returned to EDD all of the funds covered by the trial court's October 25, 2023 order of forfeiture and levy. Counsel explained that "[t]here was no oversight by the court to determine whether all the funds in the 60

12

accounts were surrendered to EDD, or access to the bank accounts by defense counsel to determine whether Bank of America turned over all the funds to EDD." According to counsel, it was "important to know precisely the dollar amounts in the accounts to determine whether the Bank has turned over all of the funds in those accounts to EDD."

The trial court concluded that counsel had not shown good cause to obtain the Bank of America documents on that basis. As the trial court pointed out at the March 5, 2024 hearing, "[a] request was made of [Bank of America] to disgorge itself of all of the money in those accounts," and counsel had presented "no reason to believe that there's any additional information in the [Bank of America] accounts . . . that would reflect uncollected ill-gotten gains." As we will explain, the trial court properly reached that conclusion.

One reason for counsel's belief that additional funds might still exist in the Bank of America accounts was the history of the People's investigation of those accounts. Counsel for Marquez cited a statement made by an investigator for the District Attorney's office in 2021 in a statement of probable cause to support the Penal Code section 186.11 petition to freeze and recover the funds in the Bank of America accounts. According to counsel, the investigator stated that there was $123,516.30 in the Bank of America accounts associated with defendants' fraud, instead of the higher figure of $147,140.84 that Bank of America eventually identified and returned to EDD

in response to the trial court's October 25, 2023 order of forfeiture and levy.[3] According to counsel, that discrepancy established a need to verify whether Bank of America identified all of the relevant funds in the accounts and returned them to EDD.

The argument is not persuasive. The trial court's October 25, 2023 order of forfeiture and levy included a list of the 60 account holder names and debit card numbers associated with the accounts, and it directed Bank of America to turn over all the funds in those accounts. The fact that Bank of America was able to locate and return funds in a *higher* amount than identified by the District Attorney's investigator in 2021 does not reasonably raise any doubt about whether Bank of America fully complied with the trial court's October 25, 2023 order of forfeiture and levy.

Next, counsel for Marquez attempted to cast doubt on whether Bank of America had turned over all of the relevant funds by raising the possibility that Bank of America had deducted fees or other amounts while administering the accounts. Counsel argued to the trial court that "it was unknown whether the Bank deducted fees from the accounts. Fees deducted

---

[3] The appellate record does not contain the investigator's 2021 statement. We accordingly refer to the description of that statement provided by counsel for Marquez in his briefing to the trial court. Another statement made by counsel for Marquez in that same briefing suggests the discrepancy between the amount identified by the investigator in 2021 and the amount eventually returned by Bank of America to EDD might be explained by the fact that the investigator had not, at the time, identified all the relevant accounts. Specifically, as stated in Marquez's trial court briefing, "Although [the] investigator . . . identified 47 accounts, the order drafted by the People and signed by [the trial court] on 03/15/22 listed 60 names." Similarly, the trial court's October 25, 2023 order of forfeiture and levy to Bank of America also identified 60 names associated with 60 accounts, rather than 47.

14

from the accounts would reduce the balances in the accounts and reduce the amount of money returned by Bank of America to EDD."[4]

As the trial court reasonably concluded, however, documents that might show Bank of America deducted fees or other amounts in administering the accounts were not relevant to determining the amount of restitution that defendants owed to EDD. Penal Code section 1202.4, subdivision (f)(3) states that the trial court should order restitution in "a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct, including, but not limited to . . . [¶] (A) Full or partial payment for the value of stolen or damaged property. The value of stolen or damaged property shall be the replacement cost of like property, or the actual cost of repairing the property when repair is possible." It was undisputed that EDD was defrauded by defendants in the amount of $1,200,888. That amount was paid by EDD into the Bank of America accounts. The purpose of the March 5, 2024 restitution hearing was to determine how much of that $1,200,888 had been recovered and returned to EDD so that the recovered funds could be deducted from the restitution order. Documents that might have shown that some of the $1,200,888 deposited in the accounts was

---

[4] For the first time on appeal, and without providing a factual basis, Marquez suggests that Bank of America may have committed misconduct by deducting "unauthorized" fees. Specifically, Marquez states, "if . . . the bank arbitrarily imposed *unauthorized fees* for the transactions it handled, the money may rightfully belong to EDD and would reduce the amount of the restitution order . . . ." (Italics added.) Because no such accusation of improper conduct was raised in the trial court as a ground for obtaining in camera review and release of the subpoenaed documents, we will not consider it when evaluating whether the trial court erred with respect to the Bank of America documents.

15

depleted due to bank fees or other charges imposed by Bank of America was not probative in determining the amount that *remained* in the Bank of America accounts and that Bank of America was able to *return* to EDD.

Moreover, even if Marquez were able to prove that Bank of America *did* deduct fees or other charges while administering the accounts, she has not identified any legal basis to require Bank of America to turn over those deducted funds to EDD. If some of the stolen funds were consumed by the expense of holding them in a bank account, that is a consequence for which defendants are responsible, not Bank of America.

In sum, the trial court properly concluded that nothing in the documents subpoenaed from Bank of America would assist the court in determining EDD's economic loss.

### 2. *The CDCR Documents*

The second subpoena concerned CDCR's production of documents related to the trust accounts of the 60 inmates whose personal identifying information was fraudulently used by defendants to obtain benefits from EDD. Counsel for Marquez argued that the documents were relevant because they might reveal culpable individuals whom the People could target to recover additional funds belonging to EDD. Specifically, counsel sought evidence of "deposits which would look like . . . 'kick-backs' to the inmate from one of the defendants for having provided his personal identifying information to the defendant for the purpose of defrauding EDD." He explained that "[i]f it is determined based on a review of the records that inmates were involved in the scheme to defraud EDD, . . . these inmates should be held responsible based on 'joint and several' liability for the sum due EDD." Although counsel acknowledged that Marquez did not have any authority to pursue third parties that may have participated in the

16

fraudulent scheme, he contended that the People *did* have the ability to institute proceedings against them. Counsel therefore proposed to the trial court that it "create an incentive for the prosecution to pursue other assets" through "a reduction in the size of the restitution order based on the value of any assets which the [People] refuse[ ] to pursue."

At the February 22, 2024 hearing, the trial court expressed skepticism regarding counsel's argument and asked him to provide supporting legal authority. The trial court stated, "If the defense plans to ask the court to offset the restitution amount by amounts of money that may have been given to uncharged defendants, I would ask for authority. I don't know that the court has jurisdiction to request restitution from someone who is not a co-defendant and who is not a defendant in a lawsuit. So if you have got any case law, I welcome that." Counsel did not provide any legal authority to the trial court either prior to, or at, the March 5, 2024 restitution hearing.

At the March 5, 2024 hearing, the trial court returned to the subject. It stated, "There's a separate legal issue, which is, even if there's money out there that could be clawed back, it was basically kickbacks to people who may have allowed their personal identifying information to be used for fraudulent purposes, not necessarily could, but should the Court reduce any restitution amount ordered by those amounts? I think the District Attorney's Office can prosecute who it wants to prosecute and can't be forced by this Court or any other Court to prosecute people who may have been in on the scheme if, in fact, they were in on the scheme. And I think that . . . there is an argument that can be made that a cost of doing business, including illegal business, is to pay off your subcontractors and pay off your employees. And if you use stolen money to do that, I don't know that it makes sense for a defendant to be able to require the prosecution or law enforcement to then chase down

17

where they've spent the stolen money, which I think is what I'm being asked to do." The trial court therefore concluded that the inmate trust account documents that counsel for Marquez had subpoenaed from CDCR were not relevant to the issue of how much restitution the court should order.

On appeal, Marquez continues to pursue the same line of argument regarding the relevance of the CDCR documents. Specifically, Marquez argues that the documents have "the potential of leading to evidence that would reduce the amount of EDD's loss by recapturing unlawful sums received by inmates who participated in the fraud." As in the trial court, Marquez provides no authority that would allow a trial court to reduce a victim restitution award upon a defendant's showing that culpable uncharged parties may have received some of the ill-gotten funds. The aim of a victim restitution order is to determine "a dollar amount that is sufficient to fully reimburse the victim or victims for every determined economic loss incurred as the result of the defendant's criminal conduct." (Pen. Code § 1202.4, subd. (f)(3).) Marquez's attempt to develop evidence that the defendants may have distributed some of EDD's funds to culpable third parties as "kickbacks" has no place in such a proceeding. Accordingly, the trial court properly ruled that the documents counsel for Marquez subpoenaed from CDCR were not relevant to the issues presented at the March 5, 2024 restitution hearing.

### 3. *Conclusion*

In sum, the issue at the March 5, 2024 restitution hearing was the amount of economic loss incurred by EDD as a result of Marquez's criminal conduct. (Pen. Code, § 1202.4, subd. (f)(3).) Because the documents that counsel for Marquez subpoenaed from Bank of America and CDCR were not relevant to that issue, the trial court's denial of the request that it review and then release the documents (1) did not render the restitution hearing

18

" 'fundamentally unfair' " in violation of Marquez's right to procedural due process (*Marrero*, supra, 60 Cal.App.5th at p. 911); and (2) did not prevent Marquez from obtaining documents " 'both material and favorable to [her] defense' " in violation of whatever compulsory process rights might exist in this context (*Bryant*, *supra*, 60 Cal.4th at p. 367).

## DISPOSITION

The victim restitution order issued on March 5, 2024 is affirmed.

IRION, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.